UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

WILLIE C. SIMPSON,

                    Plaintiff,

        v.                                     Case No. 19-cv-1222-pp

CAPTAIN VANLANEN, CAPTAIN BAUMANN
and SUE PETERS,

                    Defendants.

**ORDER GRANTING DEFENDANT SUE PETERS'S MOTION FOR SUMMARY
JUDGMENT (DKT. NO. 103), GRANTING DEFENDANTS VANLANEN AND
BAUMANN'S MOTION FOR SUMMARY JUDGMENT (DKT. NO. 116)
AND DISMISSING CASE**

        Plaintiff Willie C. Simpson, who is representing himself, sued under 42

U.S.C. §1983 on Eighth Amendment claims against officials at Green Bay

Correctional Institution. The defendants move for summary judgment on the

merits of the plaintiff's claims. Dkt. Nos. 103, 116. The plaintiff opposes the

motions. Dkt. No. 123. The court will grant the motions and dismiss the case.

**I.      Facts**

        A.      <u>Procedural Background</u>[1]

        On August 15, 2022, the court granted the defendants' motions for partial

summary judgment on the ground that the plaintiff failed to exhaust his available

administrative remedies before initiating this federal lawsuit. Dkt. No. 98. The

court dismissed as unexhausted the plaintiff's claims that defendants Jean

Lutsey and Sue Peters discontinued his A&D ointment and falsified his medical

---

[1] The court thoroughly described the procedural history in its previous orders.
Dkt. No. 23 at 1–3; Dkt. No. 98 at 2–6. The court provides the following additional
details only as they relate to the defendants' motions for summary judgment.

records. Id. at 15–18. Because there were no remaining, exhausted claims against defendant Lutsey, the court dismissed Lutsey from the lawsuit. Id. at 22. The court also dismissed an unknown "John Roe" defendant because the plaintiff had failed to prosecute his claim against that person. Id. at 21–22. The court recounted that this left the plaintiff's Eighth Amendment claims that defendants Captain Jay VanLanen and Captain Ryan Baumann (collectively "DOC Defendants") falsely cited institution security policy to deny him access to a basin to soak his toes and that defendant Peters disregarded instructions to provide him Ensure and double-portion high-calorie meals three times a day. Id. at 5. Peters conceded that the plaintiff had exhausted that claim against her. Id. at 15 n.3.

On October 4, 2022, the court entered an order granting the defendants' motion to strike the plaintiff's motion for summary judgment. Dkt. No. 99. The court explained that in a previous appeal, the Seventh Circuit had imposed a filing restriction on the plaintiff that prohibits him from filing any offensive motions, which includes a motion for summary judgment. Id. at 11 (citing Simpson v. Litcher, Seventh Circuit Case No. 20-3293 (7th Cir. Mar. 19, 2021)). The court struck from the docket the plaintiff's motion for summary judgment and his supporting materials. Id. at 12.

The next day—October 5, 2022—the court issued an amended scheduling order. Dkt. No. 100. That order set a January 6, 2023 deadline for the defendants to file motions for summary judgment on the merits of the plaintiff's claims. Id. At the January 6, 2023 deadline, defendant Peters filed a motion for summary judgment and supporting documents. Dkt. Nos. 103–107. Defendants VanLanen and Baumann twice requested an extension of time to file their motion. Dkt. Nos. 108, 112. The court granted those motions, dkt. nos. 110, 113, and the DOC

Defendants filed their motion for summary judgment and supporting materials on January 27, 2023. Dkt. Nos. 116–121.

On January 24, 2023, the court received the plaintiff's one-page response and affidavit addressing Peters's motion for summary judgment. Dkt. Nos. 114–115. The plaintiff asserted that he was being transferred to another correctional institution and "cannot present the facts essential to justify apposing [*sic*] defendant's motion for partial summary judgment within the 30 day time limit." Dkt. No. 114 at 1. On January 31, 2023, the court ordered that by the end of the day on February 27, 2023, the plaintiff must file a joint response to both motions for summary judgment and both sets of proposed facts. Dkt. No. 122. The plaintiff timely filed his response and supporting materials, which include his own proposed facts and responses to each of the defendants' statements of proposed facts. Dkt. Nos. 123–127. The defendants filed their respective reply briefs. Dkt. Nos. 129, 134.

B.    Factual Background

During the events that gave rise to his complaint, the plaintiff was a prisoner at Green Bay Correctional Institution. Dkt. No. 118 at ¶1. He was transferred to the Wisconsin Secure Program Facility on January 12, 2023. Id. Defendant VanLanen is a Supervising Officer 2 (also known as a captain) at Green Bay and has been since March 2016. Id. at ¶2. Defendant Baumann was a Supervising Officer 2/Captain at Green Bay from March 2013 until November 2022. Id. at ¶3. Peters has been a nurse practitioner since 2008, and she worked at Green Bay from September 1, 2016 until December 23, 2020. Dkt. No. 105 at ¶5; Dkt. No. 107 at ¶¶1–3.

1. *Peters, Ensure Claim*[2]

As the court explained in the screening order, the plaintiff claims "that between January 2016 and January 2019 he lost at least twenty pounds" because Peters failed to provide him Ensure and extra meals to combat weight loss—"wasting"—that he experienced because of HIV. Dkt. No. 23 at 5 (quoting Dkt. No. 2 at 14). But the plaintiff does not dispute that he restricted Peters and her attorney's access to his medical files from before January 1, 2017. Dkt. No. 105-1 at 4; Dkt. No. 107 at ¶12; Dkt. No. 126 at ¶7. Peters discusses the plaintiff's medical history up to and beyond her last day at Green Bay (December 23, 2020) "to help put [her] medical care and judgment into context and to demonstrate that the totality of Plaintiff's medical treatment was reasonable, appropriate, and conformed [to] the applicable standard of care at all times [she] was involved." Dkt. No. 105 at ¶9. The facts below discuss the plaintiff's medical history from January 2017 through January 2021 (the period the parties have discussed).

The plaintiff's primary offsite provider for his HIV was Dr. Bennett Vogelman at University of Wisconsin (UW) Hospital and Clinics. Dkt. No. 105 at

---

[2] The plaintiff responds to several of Peters's proposed facts by asserting, without evidence or elaboration, that Green Bay falsified his medical records. See Dkt. No. 125 at ¶¶14, 26–27; Dkt. No. 126 at ¶¶30–33, 38–51, 58, 60, 63–66, 81–82. He does not specify which portions of the records he believes were falsified; he appears to assert that his full medical record is illegitimate. The plaintiff nonetheless relies on several pages of his medical records, which both he and the defendants attached as exhibits, to support his proposed facts. Dkt. No. 125-1. The plaintiff cannot create a genuine dispute of fact by claiming—without evidentiary support—that his certified medical records are false. See Davis v. Gee, No. 14-cv-617-wmc, 2017 WL 2880869, at *5 (W.D. Wis. July 6, 2017) (citing Scott v. Harris, 550 U.S. 372, (2007); and Springer v. Durflinger, 518 F.3d 479, 484 (7th Cir. 2008)). The court has dismissed the plaintiff's unexhausted claim about his falsified records, and it will not discuss that issue further in this order.

¶14; Dkt. No. 125 at ¶6. The plaintiff also saw Dr. Ryan Westergaard beginning around January 2021. Dkt. No. 107 at ¶90; Dkt. No. 105-2 at 5–7.

On January 5, 2017, the plaintiff weighed 182 pounds. Dkt. No. 107 at ¶38; Dkt. No. 105-1 at 23. On June 14, 2017, Peters evaluated the plaintiff and noted that he frequently had refused follow-up appointments with his doctors at UW, had refused to allow prison medical staff to see him and had refused labs necessary to help manage his HIV. Dkt. No. 107 at ¶39; Dkt. No. 105-1 at 23. The plaintiff also had refused to allow medical staff to take his weight on June 22 and 27, 2017. Dkt. No. 107 at ¶40; Dkt. No. 105-1 at 23. On September 30, 2017, a registered nurse evaluated the plaintiff about his dietary concerns and noted his insistence that he receive a high-protein, high-calorie diet. Dkt. No. 107 at ¶¶41–42; Dkt. No. 105-1 at 21–22. The nurse performed a physical on the plaintiff, determined that he had no physical abnormalities, noted that he was not in distress and could walk without issue and documented his weight at 182 pounds. Dkt. No. 107 at ¶43; Dkt. No. 105-1 at 21–22.

On October 3, 2017, Peters saw the plaintiff for concerns about his diet and foot. Dkt. No. 107 at ¶44; Dkt. No. 105-1 at 19. Peters noted that the plaintiff had requested "nutritional supplementation including double portions." Dkt. No. 105-1 at 19. Peters reviewed the plaintiff's lab findings, which did not suggest that he was malnourished or below normal Body Mass Index (BMI) and weight ranges. Id. The plaintiff "became argumentative and state[d] that despite the lab findings and stable weight he [was] entitled to nutritional supplementation." Id. Peters ended the appointment because of the plaintiff's "argumentative state of mind," but she scheduled a follow-up with UW Immunology (Dr. Vogelman) via telemedicine to discuss the plaintiff's HIV status and nutrition. Id. That afternoon, the plaintiff had his telemedicine appointment with Dr. Vogelman. Dkt. No. 105-2 at 23. The plaintiff's weight was reported to Dr. Vogelman as 181

5

pounds at a height of six feet and one inch, for a BMI of 23.8. Id. at 24.
Dr. Vogelman recommended that prison staff "may double the portions of [the plaintiff's] diet and give him Ensure to prevent further weight loss." Id.[3]

Later on October 3, 2017, Peters entered the orders from Dr. Vogelman, but she notes that "some of the orders were unclear." Dkt. No. 107 at ¶63; Dkt. No. 105-1 at 25. Peters requested a dictation of Dr. Vogelman's notes to clarify his medication recommendations "and to obtain the medical basis to consider and verify the diet change." Dkt. No. 107 at ¶64; Dkt. No. 105-1 at 24. Peters had not received the full clinical notes by October 9, 2017, so she contacted UW Health. Dkt. No. 107 at ¶65; Dkt. No. 105-1 at 20. By October 11, 2017, nursing staff still did not have Dr. Vogelman's full notes, so Peters called Dr. Vogelman to obtain his verbal orders; she noted that she still needed his full clinical notes to implement the dietary change. Dkt. No. 107 at ¶66; Dkt. No. 105-1 at 20, 24. The plaintiff's October 11, 2017 medical notes from UW Health show that Peters (referred to as "Susan" in the notes) told Dr. Vogelman that a "provider" from the prison's Health Services Unit (HSU) "does not feel double portions and Ensure are necessary. Weight loss and labs are stable." Dkt. No. 105-2 at 22. Peters nonetheless entered an order for the plaintiff to receive Ensure after she received Dr. Vogelman's dictation on October 16, 2017. Dkt. No. 107 at ¶68; Dkt. No. 105-1 at 24, 27. The order provides the plaintiff "Ensure QD [for] 3 months." Dkt. No. 105-1 at 24. The plaintiff's medication profile includes an entry for Ensure at the "QD" dosage beginning October 16, 2017, with a "stop/reorder date" of January 16, 2018. Id. at 27.

---

[3] Peters notes that a BMI of between 19 and 24 is considered healthy. Dkt. No. 105 at ¶41. She also notes that the plaintiff's weight has fluctuated between as low as 176 and 182 since March 2011. Dkt. No. 107 at ¶¶58–62; Dkt. No. 105-1 at 15. Dr. Vogelman suggested a goal weight of around 190 pounds. Dkt. No. 105-1 at 15; Dkt. No. 105-2 at 15.

The plaintiff has not properly contested these facts. He asserts that Peters intentionally failed to fulfill Dr. Vogelman's recommendations, and he maintains that his medical records are falsified. In support of these disagreements, he cites his own affidavit, which reiterates that his medical records are falsified. Dkt. No. 125 at ¶14. He also cites a response to his request for information from October 10, 2017, in which non-defendant medical staff told the plaintiff that Peters "[was] reviewing [the plaintiff's] current labs and monitoring [his] weight and double portions/ensure is not indicated at this time. HSU and UW Immunology [would] continue to monitor [his] HIV status and determine proper treatment." Dkt. No. 125-1 at 7. That response was sent to the plaintiff before Peters spoke with Dr. Vogelman on October 11, 2017, confirmed his recommendations and entered the October 16, 2017 prescriber's order for Ensure. Dkt. No. 105-1 at 24, 27.

On October 19, 2017, the plaintiff filed an institutional complaint claiming that Peters and other medical staff had not provided him the double portions and the Ensure as Dr. Vogelman recommended. Dkt. No. 125-1 at 8–9. An institutional complaint examiner received the plaintiff's complaint on October 23, 2017. Id. at 11. The complaint examiner spoke with the Health Services Manager, who reviewed the plaintiff's medical records and the three-month order for Ensure, as noted above. Id. The complaint examiner concluded that, "Though the complainant says he is being denied appropriate care, it is clear from the record no such denial is, nor has taken place." Id. The complaint examiner recommended dismissing the plaintiff's complaint because the plaintiff "has and continues to be seen by medical staff concerning his problems, and there is no reason to believe his needs are not being met." Id. The plaintiff does not say whether he appealed that decision, and he did not include the complaint or any appeal with his exhibits.

7

On January 23, 2018, the plaintiff had an in-person office visit with Dr. Vogelman at UW Health in Madison. Dkt. No. 107 at ¶69; Dkt. No. 105-2 at 20. The plaintiff weighed 186 pounds, up from 181 pounds in October 2017. Dkt. No. 105-2 at 20. Dr. Vogelman concluded that the plaintiff "is doing very well" and "is gaining weight on his current diet." Id. He noted his previous recommendations for "a higher calorie, higher protein diet with Ensure." Id. He recommended that the plaintiff continue taking "Ensure and higher calorie, higher protein diet, as he is gaining weight." Id. at 20–21. It is not clear if prison medical staff approved or implemented that recommendation. But there is no evidence that the plaintiff complained about not getting Ensure or higher-calorie meals after the January 23, 2018 appointment. The plaintiff's patient medication profile has a notation on his order for Ensure that says "renew 1-24-19," initialed by "MJ" or "MT." Dkt. No. 105-1 at 27.

The plaintiff's medical records show that he refused to appear for his next two telemedicine appointments with Dr. Vogelman, one on August 28, 2018 and one on February 4, 2019. Dkt. No. 105-2 at 16–17. Someone named "Dana" at Green Bay contacted UW Health and reported that the plaintiff "would like to be seen here in clinic [at UW] but HSU has spoken with patient and was told he needed to complete a Telemed visit before they could schedule an in clinic visit for him." Id. at 16. The plaintiff asserts without elaboration or evidence that "prison staff interfered with the Telemed appointment." Dkt. No. 126 at ¶73. He says he filed institutional complaints about the incident "and clarified this with Dr. Vogelman by phone." Dkt. No. 125 at ¶26. He did not include those complaints in his exhibits, citing instead his institutional complaint history report, which shows that he filed a complaint a year earlier (on August 9, 2017) claiming that "Staff refused to allow him to attend tele-med appointment." Id.; Dkt. No. 125-1 at 17. He does not specify who these staff members were.

On March 26, 2019, Peters saw the plaintiff "for noncompliance of his HIV medications." Dkt. No. 105-1 at 11. She noted that the plaintiff had refused his medications, declined to participate in telemedicine and threatened legal action against her and staff for refusing his requests for a face-to-face visit with Dr. Vogelman in Madison. Id. Included on the plaintiff's list of medications is "Ensure, 1 can, Oral, Daily – SC." Id. On April 16, 2019, the plaintiff saw a non-defendant doctor at Green Bay, who noted that the plaintiff was "receiving a regular diet and ensure once a day in the morning." Id. at 15. The doctor did not take the plaintiff's weight, but the plaintiff told the doctor "that he is down to about 176 pounds currently." Id. The doctor opined "that both double portions and 3 times a day supplements with an sure [sic] seems excessive." Id. at 16.

The plaintiff asserts that although his health had improved by March 2018, Peters thereafter discontinued his Ensure "to sabotoge [sic] [his] treatment." Dkt. No. 125 at ¶19. He says that from March 2018 until June 2019, "[his] health declined, [his] weight dropped again, and on 6/5/2019 Dr. Vogelman reordered the ensure twice a day to prevent future weight loss." Id. He cites "Exhibit – 10 page – 11" in his exhibits, which is a note from his June 4, 2019, in-person appointment with Dr. Vogelman at UW Health. Dkt. No. 125-1 at 31 (also at Dkt. No. 105-2 at 15).

At the June 4, 2019 appointment, the plaintiff told Dr. Vogelman that "he has lost a little bit of weight going down to 177 pounds" and that he was "getting 1 Ensure a day." Dkt. No. 105-2 at 14. The plaintiff weighed 186 pounds at the clinic, but Dr. Vogelman noted that "he had 3 sets of chains on." Id. Dr. Vogelman noted that the plaintiff was "down from his peak weight of 200," but observed that the plaintiff was in no distress and "actually looked pretty good today." Id. at 15 (also at Dkt. No. 125-1 at 31). Dr. Vogelman concluded that the plaintiff's HIV "is under excellent control." Id. He again recommended that the plaintiff receive "food

double portions and Ensure twice a day until he reaches about 190 pounds of weight with no chains on, just simple clothing, and no shoes." Id. Nothing in these notes suggests that the plaintiff had not been receiving Ensure in the previous months. On June 10, 2019, Peters implemented Dr. Vogelman's recommendation and entered a pharmacy order to continue Ensure for the plaintiff twice daily (annotated "BID"). Dkt. No. 105 at ¶14; Dkt. No. 105-1 at 12 (pharmacy order for Ensure "1 bottles [sic], Oral, Form: Liquid, BID (AM/HS) - SC").

The plaintiff refused appointments for lab tests in November and December 2019 and again in March, April and May 2020 because, as noted above, he wanted to be seen in person at UW Health instead of via telemedicine. Dkt. No. 107 at ¶80; Dkt. No. 105-1 at 6–8. Green Bay staff informed UW Health that the plaintiff "has refused all Telemed appointments and only wants to be seen in [the UW] clinic." Dkt. No. 105-2 at 12–13. On April 29, 2020, a non-defendant nurse at Green Bay spoke with UW Health over the phone and requested the plaintiff's medication list via fax because he was not taking his medications. Id. at 13. The nurse told UW staff that correctional officers "went in to do a walk through of the cell and found patient had an insane amount of HIV medications he has been hoarding. . . . [I]t is hard to tell if he had 3 weeks or 3 months of medications in his cell." Id. Other notes in the plaintiff's medical records include entries between November 2019 and March 2020 where staff witnessed him "accept[] Ensure and then dump[] entire bottle down the drain" or take the "Ensure and dump[] it all in the toilet." Dkt. No. 105-1 at 13–14. The plaintiff contends that he did not refuse or misuse his medications; he asserts that "guards responsible for delivering the ensure refused to provide it to [him]," so he filed institutional complaints against them. Dkt. No. 125 at ¶25.

The plaintiff says that on May 5, 2020, Peters again discontinued his Ensure prescription as his "health began to improve." Id. at ¶21. The plaintiff says he filed an institutional complaint against Peters, but that complaint is not in the record. He again cites only his complaint history report, which shows that on May 5, 2020, he filed a complaint claiming that his "prescription for Ensure and aspirin were discontinued." Dkt. No. 125-1 at 20.

On May 14, 2020, Peters emailed Dr. Vogelman to express her concern about the plaintiff not taking his HIV medications and needing a renewal of his prescriptions. Dkt. No. 107 at ¶84; Dkt. No. 105-2 at 10. Peters wrote that she had spoken with other medical staff at Green Bay and was "waiting for a reply for offsite transportation verses perusing [*sic*] an appointment per telemedicine." Dkt. No. 105-2 at 10. She noted that the plaintiff had "refused telemedicine and lab studies with last attempt to collect specimens last week." Id. She explained that the plaintiff refused follow-up appointments with the HSU and refused to appear for treatment. Id. Peters opined that the plaintiff might "accept Dr. Vogelman's explanation." Id. Dr. Vogelman provided a response to UW staff, who forwarded that response to Peters. Id. Dr. Vogelman commented that the plaintiff was "entitled to refuse his prescriptions," but directed that until he could speak with the plaintiff, "the prescriptions should say [*sic*] as is." Id. He added that if prison medical staff did "not want to give them to him because he is not taking them, then they can hold them until he demonstrates usage of them." Id.

On May 19, 2020, the plaintiff refused an examination by a non-defendant doctor "despite being informed it was to review his plan of care with the physician." Dkt. No. 105-1 at 5. The doctor noted that the plaintiff "has demonstrated a repeated resistance and refusal to follow his plan of care." Id.

A week later, on May 26, 2020, prison nursing staff called Dr. Vogelman because the plaintiff was refusing to take his HIV medication, and staff "wanted

to be sure he understood the consequences of doing that as well as not having his vitals done and having his blood tests drawn." Dkt. No. 107 at ¶86; Dkt. No. 105-2 at 8. Dr. Vogelman participated in the phone call, which lasted over half an hour. Dkt. No. 105-2 at 8–9. Dr. Vogelman noted that the plaintiff's HIV "was undetectable" when he last saw the plaintiff a year earlier. Id. at 9. Dr. Vogelman recalled that, "For some reason, [the plaintiff] missed the 6 month followup appointment that [Dr. Vogelman] had made and wanted a followup." Id. Dr. Vogelman's notes do not say anything about prison staff sabotaging or interfering with the missed appointments. Id. He observed that "the plaintiff canceled" one follow-up appointment in December 2019, and that the clinic had paused in-person visits since because of the COVID-19 pandemic. Id. The plaintiff told Dr. Vogelman "that the medications are being withheld from him . . . [and] that other medications including Ensure . . . are also not given to him regularly and is variability [sic]." Id. Dr. Vogelman reported that "the nurse involved with [the plaintiff's] care" who was on the call "assure[d Dr. Vogelman] that his medications are perfectly available to him." Id. That nurse also told Dr. Vogelman that the plaintiff was found "mouthing" his medications, and that he had misbehaved by "stocking up feces and urine and then exposing the guards to those excretory products." Id. She expressed frustration about the prison "spending taxpayer dollars on" the plaintiff's medications "if he [was] not going to be taking" them. Id. The plaintiff asserts it was Peters on the call who made the comments in reference to the plaintiff's prescription for Ensure. Dkt. No. 125 at ¶22.

Dr. Vogelman described the plaintiff as "calm and collected on the phone," and he wrote that the plaintiff "clearly understands the consequences of not taking his medications." Dkt. No. 105-2 at 9. He noted that the plaintiff recalled his target weight of 190 pounds and expressed interest in having his blood levels

and weight checked by prison medical staff. Id. Dr. Vogelman reported that the plaintiff's statements were "different than what nursing told [him] about [the plaintiff's] refusal of some of those" lab tests, but the records confirmed that the plaintiff "did cancel [the] December appointment." Id. Dr. Vogelman wrote that he was "interested in [the plaintiff's] Ensure as a supplement to have him reach target weight of about 190 pounds." Id.

On January 5, 2021, the plaintiff saw a new specialist at UW Health, Dr. Westergaard. Dkt. No. 107 at ¶90; Dkt. No. 105-2 at 5–7. The plaintiff weighed 181 pounds, and Dr. Westergaard noted the plaintiff's preference to continue receiving Ensure supplements. Dkt. No. 105-2 at 7. Dr. Westergaard described the Ensure supplements as "beneficial" because the plaintiff's "weight is stable and up from a low point of 168 in the past several years." Dkt. No. 105-2 at 7. Peters's last day at Green Bay was December 23, 2020, so by the time of this appointment, she no longer was providing the plaintiff treatment. Dkt. No. 105 at ¶63.

Peters contends that Dr. Vogelman's recommendation for Ensure "was only one component of his larger HIV treatment plan," the most important piece of which was the plaintiff's antiretroviral medication that "was always available to Plaintiff although he didn't always take it as recommended and, on at least one occasion, was found to have stockpiled the medications in his cell." Id. at ¶¶15, 17. She avers that "the food regularly provided to Plaintiff three times daily would have been enough to combat problematic weight loss, *if* Plaintiff would have consumed most of the of the food he was provided at each meal." Id. at ¶16. Peters says that if the plaintiff "felt he was unable to maintain an appropriate weight, that was a result of his failure to eat all of his meals." Id. at ¶19.

## 2. *DOC Defendants, Foot Basin*

The amended complaint alleges that Captains VanLanen and Baumann interfered with the medical treatment that a doctor had prescribed for the plaintiff's toenail infections "by using GBCI security precaution policy to prevent [him] from possessing a foot basin to soak [his] feet in which caused [him] to suffer intense pain." Dkt. No. 2 at 14.

The plaintiff submitted medical documents showing that during a telemedicine visit with Dr. Vogelman on October 3, 2017, the doctor noted that the plaintiff's toenails had "become hooked again and at times are ingrown with purulence." Dkt. No. 125-1 at 2. The doctor noted that the plaintiff previously had had podiatry care that was successful, but that he was not presently using any foot soaks. Id. The doctor summarized that the plaintiff "has problems with his toenails for which he will need podiatry care and some soaking solutions to prevent infection." Id. at 1. He recommended that the plaintiff see a podiatrist to evaluate and treat his toes and offer him Epsom salt soaks twice a day. Id.

The plaintiff also saw Nurse Peters on October 3, 2017, "for evaluation of bilateral hallux nail fungus."[4] Dkt. No. 105-1 at 19. Peters explained that the plaintiff had "bilateral hallux nail fungus with thick nails and abnormal growth," and she noted that the nail clinic at Green Bay was providing care for that issue. Id. The plaintiff requested "a podiatry appointment for removal of the nails due to the thickness that is partially attributed to his foot pain." Id. Peters examined the plaintiff's feet, which "reveal[ed] fungus with thick nails that he have [*sic*] a left curvature bilaterally." Id. Peters noted, "No active infection or inflammation is present illness [*sic*] soft tissue of the toes." Id. On October 11, 2017, Peters entered a prescription for "Epsom salt foot soak BiD [twice per day] until nail

---

[4] "Hallux" refers to the big toe on each foot.

removed." Id. at 25. She clarified in an October 16, 2017 prescriber's order that the plaintiff would receive "Epsom salt soaks BiD now until bilateral hallux nails removed by Podiatry." Id. at 24. A medical needs restriction was entered for the plaintiff to receive a foot basin and Epsom salts to soak his feet twice per day beginning on October 16, 2017 and ending January 22, 2018. Dkt. No. 118 at ¶5; Dkt. No. 121-2.

The defendants aver that as Captains, they do not decide whether a particular incarcerated person may have a foot basin. Dkt. No. 119 at ¶7; Dkt. No. 120 at ¶8. They aver that they were unaware that the plaintiff had a medical need for the foot basin. Dkt. No. 119 at ¶8; Dkt. No. 120 at ¶9. They say that during the relevant dates, the plaintiff did not write to either of them or tell them in person that someone had confiscated his foot basin, so they remained unaware that the plaintiff could not soak his feet as medical staff had directed. Dkt. No. 119 at ¶9; Dkt. No. 120 at ¶10. The Captains aver that if the plaintiff had contacted either of them about his foot basin, they would have reviewed his request, verified his medical restrictions and discussed the situation with medical staff to ensure that they and prison staff adhered to the plaintiff's medical restriction. Dkt. No. 119 at ¶10; Dkt. No. 120 at ¶11. They explain that they do not monitor incarcerated persons' medical conditions or medical restrictions as part of their routine duties. Dkt. No. 119 at ¶11; Dkt. No. 120 at ¶12. But if they noticed an incarcerated person was in distress, or if an incarcerated person reported a medical concern to them, they would follow up on those concerns using the resources available to them at the prison. Dkt. No. 119 at ¶11; Dkt. No. 120 at ¶12.

The plaintiff does not dispute that he had a medical restriction in place for the foot basin only from October 16, 2017 through January 22, 2018. Dkt. No. 127 at ¶5. But he contests the defendants' averments that they were unaware of

that restriction and would have acted differently had they known. He cites Wisconsin Department of Adult Institutions (DAI) policy 306.00.34 (although he did not attach a copy of that policy), which he says authorizes institutional security to restrict an incarcerated person from having any container if prison officials believe that the person is a threat. Id. at ¶6. He also cites a page of the Green Bay Restrictive Housing Handbook, which notes that prison staff may implement a "Loss of Container" restriction. Dkt. No. 125-1 at 12–13.

The plaintiff says Captains VanLanen and Baumann enforced these policies "to restrict plaintiff from possessing the foot basin prescribed by the DR . . . from 10/6/2017 through 11/5/2017." Dkt. No. 127 at ¶5. He cites an unsigned "Inmate Restriction/Precaution Notice" that Captain Baumann completed on October 6, 2017, related to conduct report #2993557. Dkt. No. 125-1 at 3. That notice saiid that the plaintiff was placed on a restriction during the dates the plaintiff identified "due to [his] inability to properly handle normal activities and/or materials." Id. The restriction specified that the plaintiff "made threats to dash staff next time the trap opens."[5] Id. The restriction prohibited the plaintiff from possessing any container and imposed security precautions forcing him to remain at the back of his cell when receiving items and receive them through the lower trap door of his cell. Id.

The plaintiff says that by October 30, 2017, his "toes had become very infected and painful." Dkt. No. 124 at ¶30. He filed an institutional complaint

---

[5] The court knows from other recent prisoner cases that the term "dash" as used in this context means to throw a substance (usually a bodily fluid) at staff. See Case No. 20-cv-1890-pp, Dkt. No. 103 at 13 (quoting statement from incarcerated person who threatened correctional officer to "hurrie up before [he would] dash [the officer] with some piss"). The plaintiff was charged on July 15, 2011, with throwing bodily fluids on prison staff. Dkt. No. 125 at ¶12. The court infers that the plaintiff was not allowed to have containers because he had threatened to throw bodily fluids onto prison staff the next time they opened his cell trap.

challenging enforcement of the restriction on his possessing containers because it prevented him from having the foot basin to soak his toes. Dkt. No. 127 at ¶7; Dkt. No. 125-1 at 6. An institutional complaint examiner received the complaint on October 31, 2017. No. 125-1 at 6. The complaint examiner contacted medical staff to verify that the plaintiff had the medical order for the foot basin and then contacted Captain VanLanen to ask whether the plaintiff had been allowed to soak his feet according to the restriction. Id. VanLanen told the complaint examiner that the plaintiff "did not write to him or tell him in person that his foot basin had been confiscated and was therefore unaware he had not been able to soak his foot as directed." Id. VanLanen said that "he reviewed the loss of container restriction and due to improved behavior removed the restriction." Id. He advised that if the plaintiff found himself in the same position in the future, "he should contact Capt. VanLanen so arrangements can be made for the medical restriction to be adhered to." Id. The complaint examiner concluded that the plaintiff's foot basin was taken but that "this was due to a lack of communication rather than an intent to cause harm or deny medical care." Id. The complaint examiner recommended affirming the plaintiff's complaint as of November 3, 2017 to acknowledge the error but did not recommend that the prison take further action "as the basin ha[d] been returned to [the plaintiff]." Id. On November 6, 2017, the reviewing authority accepted that recommendation and affirmed the plaintiff's complaint. Dkt. No. 131-1 at 4.

The plaintiff nonetheless appealed the reviewing authority's decision, writing that his "concern [was] the future, that security [would] continue its practice of using this security precaution no container restriction to interfere with recommended medical treatment to, security only relented because [he] filed a [*sic*] inmate complaint." Id. at 14. The plaintiff wrote that he "believe[d] that in the future, security [would] again use DOC policy restriction precaution no container

17

to deny [him] adiquate [*sic*] medical treatment." Id. A corrections complaint examiner received the appeal on November 13, 2017 and affirmed that the reviewing authority's decision on his complaint as "appropriate," noting that the plaintiff had "produced no evidence for further action." Id. at 6. The office of the secretary accepted the corrections complaint examiner's decision and recommendation to affirm the appeal. Id. at 7.

The plaintiff insists that his foot basin "was not returned even after Vanlanen and Bauman [*sic*] were made aware" of his medical restriction. Dkt. No. 127 at ¶8. He says that he told Baumann on October 6, 2017—the day his security restriction went into effect—about his medical need for the foot basin. Id. at ¶9. He says Baumann responded that he "should [have] thought about that before threatening his officers." Id. The plaintiff avers that the security restriction was not lifted until November 5, 2017 and that he did not receive the foot basin back until January 22, 2018. Dkt. No. 125 at ¶34. He says that as a result, the toenails on his index toes became infected and had to be removed. Id.; Dkt. No. 125-1 at 21.

Captain VanLanen filed a second declaration averring that he was not made aware of the plaintiff's medical restriction for a foot basin until after the plaintiff had filed his institutional complaint about it. Dkt. No. 130 at ¶3. He avers that the complaint "was the first time [he] knew that [the plaintiff] had a medical restriction for a foot basin." Id. He says that once he was made aware, he "diligently worked to make sure that [the plaintiff] received his foot basin." Id. at ¶4. He first "reviewed the loss of container restriction and removed it." Id. That allowed the plaintiff to receive his foot basin even while in the Restricted Housing Unit. Id. VanLanen does not recall the exact date he lifted the loss-of-container restriction, but he avers that it was before the institutional complaint examiner spoke with him on November 3, 2017. Id. at ¶5. He says that once he lifted the

restriction, the plaintiff "was allowed to have a foot basin in his Restrictive Housing Unit Cell." Id. at ¶6. VanLanen avers that "security staff responsible for inmate property in the Restrictive Housing Unit would then be responsible for providing the foot basin." Id.

The plaintiff's medication profile shows an entry for "Epsom salt soaks" and a "foot basin" beginning on October 11, 2017, with a "stop/reorder date" of January 22, 2018. Dkt. No. 105-1 at 27. The first "fill/order" date is October 23, 2017, but it is crossed out. Id. The order uses the code "Seg," which the court presumes refers to the plaintiff being on segregation status at the time. Id. The profile includes other fill/order dates of November 4, November 19 and December 9, 2017. Id. None of those entries is crossed out. The October 23 and November 4, 2017 orders are for one bag of Epsom salt; the other two are for two bags. Id. The plaintiff was again on segregation status at the time of the December 9, 2017 order. Id.

The plaintiff saw Dr. Vogelman at UW Health on January 23, 2018. Dkt. No. 105-2 at 19–20. Dr. Vogelman noted that the plaintiff's "toenail care has been completed and removed and he just has a little oozing from the sites today." Id. at 19. Dr. Vogelman later reiterated that the plaintiff's "overgrown onychomycosis of his D1 hallux toes has been repaired" and he had only "minimal" oozing from "his dressings" on both feet. Id. at 20. He noted that the plaintiff's "other toenails look very good at this time." Id.

**II.   Discussion**

     A.   <u>Summary Judgment Standard</u>

A party is entitled to summary judgment if he or she shows that there is no genuine dispute as to any material fact and the party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); <u>see also</u> <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986). "Material facts" are those that "might affect the outcome of

the suit." See Anderson, 477 U.S. at 248. A dispute over a "material fact" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the non-moving party." Id.

Summary judgment is proper "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). To defeat a motion for summary judgment, the non-moving party (here, the plaintiff) must provide more than assertions, allegations or denials; the plaintiff "needs to come forward with *evidence*" demonstrating his entitlement to relief and showing how each defendant was personally involved in the alleged conduct that would be sufficient to "support a jury's verdict in [his] favor" against each defendant. Beatty v. Olin Corp., 693 F.3d 750, 754 (7th Cir. 2012); see Cooper v. Haw, 803 F. App'x 942, 946 (7th Cir. 2020) (explaining that "argument alone is insufficient to avoid summary judgment").

B.     Eighth Amendment

As the court explained in the screening order, the court analyzes the plaintiff's claims under the Eighth Amendment, which "protects prisoners from prison conditions that cause the wanton and unnecessary infliction of pain, including . . . grossly inadequate medical care." Gabb v. Wexford Health Sources, Inc., 945 F.3d 1027, 1033 (7th Cir. 2019) (quoting Pyles v. Fahim, 771 F.3d 403, 408 (7th Cir. 2014)) (internal quotations omitted). Not "every claim by a prisoner that he has not received adequate medical treatment states a violation of the Eighth Amendment." Estelle v. Gamble, 429 U.S. 97, 105 (1976). To state a valid Eighth Amendment claim, the plaintiff must allege both that he "suffered from an objectively serious medical condition" and that the defendants were "deliberately indifferent to that condition." Petties v. Carter, 836 F.3d 722, 728 (7th Cir. 2016)

(*en banc*) (citing <u>Farmer v. Brennan</u>, 511 U.S. 825, 834 (1994)); <u>see Estelle</u>, 429 U.S. at 103.

To satisfy the objective component, the plaintiff must show that he had a medical condition "that is so obvious that even a lay person would perceive the need for a doctor's attention." <u>Greeno v. Daley</u>, 414 F.3d 645, 653 (7th Cir. 2005). The plaintiff also must show that the defendants were deliberately indifferent, which "describes a state of mind more blameworthy than negligence." <u>Farmer</u>, 511 U.S. at 835. A prison official shows deliberate indifference when he "realizes that a substantial risk of serious harm to a prisoner exists, but then disregards that risk." <u>Perez v. Fenoglio</u>, 792 F.3d 768, 776 (7th Cir. 2015) (citing <u>Farmer</u>, 511 U.S. at 837). "Mere dissatisfaction or disagreement with a doctor's course of treatment is generally insufficient" to violate the Eighth Amendment. <u>Johnson v. Dominguez</u>, 5 F.4th 818, 826 (7th Cir. 2021) (citing <u>Johnson v. Doughty</u>, 433 F.3d 1001, 1013 (7th Cir. 2006)). But neither may prison officials "doggedly persist[] in a course of treatment known to be ineffective." <u>Greeno</u>, 414 F.3d at 655. The plaintiff must show that the treatment he received was "'so blatantly inappropriate as to evidence intentional mistreatment likely to seriously aggravate' his condition." <u>Id.</u> at 654 (quoting <u>Snipes v. DeTella</u>, 95 F.3d 586, 592 (7th Cir. 1996)).

C.    <u>Analysis</u>

The defendants do not disagree that the plaintiff's HIV is an objectively serious medical need. They focus on whether each defendant was aware of and deliberately indifferent to the plaintiff's HIV and resultant symptoms.

1.    *Peters*

a.    Timing

The court must address a preliminary issue: the timing of the plaintiff's claim against Peters. The plaintiff filed his amended complaint on February 5,

21

2019. Dkt. No. 2 at 18. The amended complaint claims that Peters failed to provide the plaintiff high-calorie meals and Ensure between January 2016 and January 2019, causing weight loss and malnutrition. Id. at 14. But in his affidavit in support of his summary judgment response, the plaintiff says that Peters was his care provider only between October 3, 2017 and May 5, 2020. Dkt. No. 125 ¶5. He also refused to allow Peters access to his medical records before January 2017. Dkt. No. 105-1 at 4. The record includes evidence that Dr. Vogelman recommended higher calorie meals and Ensure three times during the timeframe that encompasses both the amended complaint's allegations and the plaintiff's assertion of when Peters treated him: on October 3, 2017, January 23, 2018 and June 4, 2019. But only the first two of those dates occurred before the plaintiff filed his amended complaint on February 5, 2019.

Whether Peters failed to provide the plaintiff high-calorie meals and Ensure between February 5, 2019 and her last day at Green Bay (December 23, 2020) or later is not at issue. The amended complaint alleges constitutional violations only between January 2016 and January 2019, and the plaintiff did not supplement his amended complaint to include additional allegations of mistreatment after that period. The court previously explained that "an incarcerated person cannot assert a cause of action under federal law until such administrative remedies as are available are exhausted." Dkt. No. 98 at 12 (quotation omitted). The plaintiff filed his complaint on February 5, 2019; he could not have exhausted his administrative remedies for any claim that accrued after that date. Id. at 17–18 (quoting Ford v. Johnson, 362 F.3d 395, 398 (7th Cir. 2004)) ("'Section 1997e(a) says that exhaustion must *precede* litigation. "No action shall be brought" *until* exhaustion has been completed.'"). The court will analyze whether the plaintiff has demonstrated a genuine dispute of material fact about whether Peters was deliberately indifferent to his need for high-calorie meals and Ensure only

between January 2017 and February 5, 2019. The court will not consider any alleged mistreatment that occurred after February 5, 2019, because the plaintiff did not exhaust (and could not have exhausted) his administrative remedies for those claims *before* bringing this lawsuit.

> b. The Plaintiff's Claim

The plaintiff does not meaningfully dispute Peters's facts; he asserts—without evidence—that Peters ignored Dr. Vogelman's orders. But the plaintiff's undisputed, certified medical records contradict his assertion. Those records show that Peters reviewed Dr. Vogelman's recommendations from the plaintiff's October 3, 2017 appointment; followed-up with Dr. Vogelman on October 9 and 11, 2017 to clarify his recommendations; and on October 16, 2017 entered a pharmacy order for Ensure twice a day. That prescription remained in effect for three months, until January 16, 2018. Dkt. No. 105-1 at 24, 27. Dr. Vogelman next saw the plaintiff on January 23, 2018, and he noted that the plaintiff looked well and had gained weight. He recommended that the plaintiff remain on Ensure and receive high-calorie meals. There is no evidence showing whether Peters (or any Green Bay medical staff) approved or rejected that recommendation. But there is no evidence showing that the plaintiff complained about not receiving Ensure or higher-calorie meals after the January 23, 2018 appointment. The plaintiff's prescription for Ensure was renewed in January 2019, although it is not clear who renewed it. The initials in the plaintiff's records are difficult to discern but appear to be either "MJ" or "MT." Dkt. No. 105-1 at 27. Peters again renewed the plaintiff's prescription for Ensure in June 2019, after the plaintiff had another appointment with Dr. Vogelman. Id. at 12. There is no evidence that Dr. Vogelman recommended that the plaintiff receive Ensure *three* times a day, as the amended complaint alleges. Dr. Vogelman recommended double portions or

23

higher-calorie, higher-protein meals and Ensure up to twice per day. See Dkt. No. 105-2 at 15, 20–21, 24.

It is undisputed that, although Peters accepted Dr. Vogelman's recommendation to provide the plaintiff Ensure up to twice per day, she did not follow Dr. Vogelman's recommendation to provide the plaintiff double meals or higher-calorie, higher-protein meals. In certain situations, "'a defendant's decision to ignore instructions from a specialist'" may suggest that she disregarded a risk to the incarcerated person's health or safety. Wilson v. Adams, 901 F.3d 816, 822 (7th Cir. 2018) (quoting Zaya v. Sood, 836 F.3d 800, 806 (7th Cir. 2016)). But "that does not mean that a doctor must always follow the recommendation of a specialist." Id. (citing Petties v. Carter, 836 F.3d 722, 729 (7th Cir. 2016)). "A medical professional's treatment decisions will be accorded deference 'unless no minimally competent professional would have so responded under those circumstances.'" Jackson v. Kotter, 541 F.3d 688, 698 (7th Cir. 2008) (quoting Sain v. Wood, 512 F.3d 886, 894–95 (7th Cir. 2008) (internal quotation omitted)). "Disagreement between a prisoner and his doctor, or even between two medical professionals, about the proper course of treatment generally is insufficient, by itself, to establish an Eighth Amendment violation."). Pyles, 771 F.3d at 409 (citing Johnson, 433 F.3d at 1013).

The evidence does not support a finding that Peters acted unreasonably or outside the bounds of professional norms. Peters's notes in the plaintiff's medical records show that she reached out to Dr. Vogelman several times after the October 3, 2017 appointment to clarify his recommendations and medication prescriptions. She implemented his recommendation to provide the plaintiff Ensure twice daily even though she disagreed that the plaintiff needed nutritional supplementation. She later renewed that prescription, despite her disagreement about its necessity. She continued to monitor the plaintiff's weight and BMI,

24

which remained within normal ranges. Other non-defendant medical staff at Green Bay who reviewed the plaintiff's medical chart and examined him agreed that double portions and supplementation with Ensure "seemed excessive." Dkt. No. 105-1 at 16. This evidence shows that Peters's decision not to follow Dr. Vogelman's dietary recommendations for the plaintiff was, at most, a disagreement between two medical professionals. There is no evidence that Peters's decision was "a substantial departure from accepted professional judgment, practice, or standards." Sain, 512 F.3d at 895. Peters's additional effort to clarify Dr. Vogelman's recommendations also shows that Peters was not disregarding the plaintiff's HIV and symptoms from his illness. She exercised her medical judgment and based her treatment decisions on Dr. Vogelman's notes and recommendations, the labs from the plaintiff's tests, her in-person examinations of the plaintiff and the plaintiff's progress and response to treatment. That is not deliberate indifference. See Zaya, 836 F.3d at 805 ("By definition a treatment decision that's based on professional judgment cannot evince deliberate indifference because professional judgment implies a choice of what the defendant believed to be the best course of treatment.").

The plaintiff's medical records do not support his allegation that he lost "at least twenty pounds" between January 2017 and January 2019 or that he suffered from symptoms of malnutrition—including the "dizziness and weakness" he alleged in his amended complaint—without the higher-calorie, higher-protein meals. The plaintiff weighed 182 pounds on January 5 and September 30, 2017; 181 pounds at his October 3, 2017 appointment; 186 pounds at his January 23, 2018 appointment; and either 177 or 186 pounds on June 4, 2019. The plaintiff refused a telemedicine appointment in August 2018, so there is no evidence in the record of what his weight was at that time. Dr. Vogelman did not note that the plaintiff was in distress at any of their appointments, and he observed that the

25

plaintiff "looked pretty good" at the June 4, 2019 appointment. Peters reviewed the plaintiff's weight and BMI on multiple occasions and concluded that they were within normal, healthy ranges. The plaintiff's medical records show that when the plaintiff followed the standard diet plus the prescribed Ensure, he *gained* weight—from 181 pounds on October 3, 2017 to 186 pounds on January 23, 2018. His medical records show occasions on which he did not drink the Ensure and dumped it into the sink or into the toilet. Yet by June 2019, his weight fell to 177 pounds—only nine pounds less than his high of 186 pounds in January 2018. The evidence in the plaintiff's medical records and his relatively stable weight do not support a finding that Peters's decision not to provide the plaintiff double or higher-calorie meals negatively affected his weight or contributed to his "wasting."

Even accepting the plaintiff's version that prison staff irregularly provided him Ensure, he faults the "guards" who were supposed to provide him Ensure but often refused to do so. He does not claim, and there is no evidence, that *Peters* personally refused to provide Ensure to the plaintiff or kept prison staff from distributing it to him. The amended complaint claims only that Peters failed to follow Dr. Vogelman's dietary recommendations. Dkt. No. 2 at 14–15. The court has explained why that claim has no merit. The plaintiff's assertions that guards refused to provide him Ensure does not support his claim against Peters and actually suggests that he had an active prescription for Ensure. The plaintiff is not proceeding on a claim against correctional officers for failing to distribute his prescribed supplement, and Peters cannot be held liable as his medical provider for correctional staff's refusal to distribute Ensure according to that prescription. See Burks v. Raemisch, 555 F.3d 592, 595 (7th Cir. 2009) ("[P]ublic employees are responsible for their own misdeeds but not for anyone else's.").

The undisputed facts show that, at most, Peters disagreed with Dr. Vogelman's treatment recommendations for the plaintiff's diet. But Vogelman's recommendations were just that—*recommendations*. The evidence shows that Peters exercised her medical judgment and partially implemented Dr. Vogelman's dietary recommendations by prescribing the plaintiff Ensure supplements twice a day. When the plaintiff followed the standard diet with the addition of Ensure, he gained weight. There is no evidence that he lost considerable weight or that his weight fell below normal, healthy ranges between January 2017 and January 2019. Nor is there evidence that the plaintiff suffered dizziness or weakness because of malnutrition. A reasonable jury viewing this evidence could not conclude that Peters was deliberately indifferent to the plaintiff's weight or "wasting" because of his HIV by declining to provide him high-calorie, high-protein meals in addition to Ensure twice a day. Peters is entitled to judgment as a matter of law.

      2.    *DOC Defendants*

It is undisputed that from October 16, 2017, through January 22, 2018, the plaintiff had a medical restriction to have a foot basin in his cell in which to soak his feet twice a day. The parties agree, and the evidence confirms, that a prescription order for the foot basin was entered on October 11, 2017. It also is undisputed that on October 6, 2017—five days *before* the plaintiff's prescription for the foot basis was entered and ten days *before* the restriction began—Captain Baumann entered a security restriction against the plaintiff that included a container prohibition because he had threatened to "dash" staff the next time they opened his cell trap.

The plaintiff avers that on October 6, 2017, when Baumann entered the security restriction, the plaintiff told Baumann that he had a medical need for a basin to soak his feet, and Baumann responded that the plaintiff should have

considered that when he threatened prison staff. Even if that exchange occurred, the plaintiff *did not* have a medical restriction for the foot basin as of October 6, 2017. On October 3, 2017, he had a telemedicine visit with Dr. Vogelman, who said he would recommend that the prison consider allowing the plaintiff foot soaks. The same day, Peters examined the plaintiff's toes, noted the "bilateral hallux nail fungus with thick nails and abnormal growth" and documented the plaintiff's request for "a podiatry appointment for removal of the nails due to the thickness that is partially attributed to his foot pain." Dkt. No. 105-1 at 19. But it was not until October 11, 2017 that Peters entered the prescription for the foot basin, and medical staff did not approve the medical restriction to begin until October 16, 2017. That means that when Baumann entered the security restriction on October 6, 2017, the plaintiff had no medical restriction providing him access to a foot basin. Baumann could not have known about a medical restriction that did not exist, and he could not have fabricated a container restriction just to remove the plaintiff's foot basin, which the plaintiff did not yet have and was not yet allowed.

Captain VanLanen avers that he did not know about the plaintiff's medical restriction until around November 3, 2017, when the complaint examiner contacted him about the plaintiff's institutional complaint. The complaint examiner's recommendation confirms VanLanen's account. The plaintiff does not contest VanLanen's account; he does not say he told VanLanen at any point before filing his institutional complaint that he had a medical restriction for the foot basin. He does not suggest that between October 6 and 30, 2017, he told *anyone* about his toes and the need for the foot basin. He says only that he filed the complaint on October 30, 2017 because his toes had become infected and painful. Even if he had told some staff member about his concerns, he did not have the medical restriction until October 16, 2017; again, he would have had no

28

basis for complaining about not being allowed access to the basin before that date.

Section 1983 "creates a cause of action based on personal liability and predicated upon fault; thus, liability does not attach unless the individual defendant caused or participated in a constitutional violation." Hildebrant v. Ill. Dep't of Nat. Res., 347 F.3d 1014, 1039 (7th Cir. 2003) (quoting Vance v. Peters, 97 F.3d 987, 991 (7th Cir. 1996)). Supervisory officers (like the Captains) generally cannot be held liable for the actions of their subordinates. Ashcroft v. Iqbal, 556 U.S. 662, 676 (2009). To be held liable for subordinate conduct under §1983, supervisors "must know about the conduct and facilitate it, approve it, condone it, or turn a blind eye for fear of what they might see." Sanville v. McCaughtry, 266 F.3d 724, 740 (7th Cir. 2001). This means that the DOC Defendants cannot be held liable for the delayed return of the plaintiff's foot basin after his container restriction was lifted unless they *personally* refused to return it, directed staff not to return it or were aware that it had not been returned and knowingly approved that conduct directly or indirectly.

There is no evidence that either VanLanen or Baumann personally failed or refused to provide the foot basin to the plaintiff. Both aver that the plaintiff never contacted them about his medical restriction or his need for the foot basin. VanLanen avers that he immediately removed the container restriction once he was aware of the plaintiff's medical restriction, so the plaintiff would have been allowed to have the basin in his restricted housing cell. The plaintiff does not contest that he never contacted the Captains about his medical restriction outside of filing the institutional complaint, which resolved the issue. Nor is there evidence that either Captain told his staff not to return the basin to the plaintiff. To the contrary, VanLanen avers that he removed the plaintiff's container restriction, and it would then have been the responsibility of "security staff

responsible for inmate property in the Restrictive Housing Unit" to provide the basin to the plaintiff. Dkt. No. 130 at ¶6. If security staff failed to provide the plaintiff the basin, neither VanLanen nor Baumann can be held responsible unless there is evidence that they told security staff not to provide it or were aware they failed to provide it to the plaintiff and simply "turn[ed] a blind eye." There is no such evidence.

The plaintiff insists that he went without the basin and did not receive it until January 2018. He says that he had to have his toenails removed because of the infection that resulted. But the plaintiff's patient medication profile shows that he was provided the basin and one or two bags of Epsom salt on at least three occasions in November and December 2017. The last of those orders occurred while the plaintiff was in segregation. He also was scheduled to receive the salt treatment on October 23, 2017, but the order is crossed out. That could be a result of the no-container restriction that was in place at the time and the fact that VanLanen had not yet lifted it (because he was not yet aware of it). The plaintiff's other medical notes also suggest that he was provided Epsom salt and the foot basin with the express goal of having his overgrown and/or infected toenails removed. The plaintiff requested a podiatry appointment to remove his infected nails during his October 3, 2017 appointment with Peters, and Peters's October 16, 2017 prescriber's order for the salt and foot basin includes the note "Epsom salt soaks BiD now *until bilateral hallux nails removed* by Podiatry." Dkt. No. 105-1 at 24 (emphasis added). Dr. Vogelman's note from the plaintiff's January 23, 2018 appointment explains that the plaintiff's "toenail care has been completed and removed," and that the fungal infection on his "hallux toes has been repaired." Id. at 19–20. That suggests that removal of the plaintiff's infected toenails was *the goal* of providing him the foot basin and Epsom salt soaks; it was not an unintended consequence of him *not* being provided the foot basin.

The plaintiff's appeal from the affirmance of his institutional complaint also suggests that, contrary to the statements in his summary judgment materials, he did receive the basin in November 2017. The plaintiff wrote in his appeal that "[his] concern is the future," that he was worried that security staff would again use the security restriction to take away his foot basin. Dkt. No. 125-1 at 14. He wrote that he "believe[s] that in the future, security *will again* use DOC policy restriction precaution no container to deny [him] adequate medical treatment." Id. (emphasis added). That suggests that he received his foot basin in November 2017, and that he was appealing his complaint because he wanted further action taken to prevent security staff from "again" taking the basin away from him "in the future."

Even if the plaintiff never received his foot basin in November 2017, no reasonable jury could conclude that Captains VanLanen and Baumann are responsible for him not getting it. If the plaintiff did not receive his basin after the institutional complaint examiner affirmed his October 30, 2017 complaint, the plaintiff could have and should have contacted either VanLanen or Baumann about the issue. There is no evidence that he contacted either of the Captains or anyone else on staff about his missing basin after filing that complaint. Nor is there evidence that the plaintiff filed another institutional complaint about the issue. The plaintiff's complaint history report shows that he filed no follow-up complaint about his foot basin during the dates his medical restriction was in effect. Dkt. No. 125-1 at 17–18. His toenails then were successfully treated and removed in January 2018. Because there is no evidence that either Captain personally and intentionally removed the plaintiff's foot basin or failed to provide it to him while his medical restriction was in effect, no reasonable jury could find that they were deliberately indifferent to his medical need in violation of his

Eighth Amendment rights. The court will grant Captains VanLanen and Baumann's motion for summary judgment.[6]

## III.  Conclusion

The court **GRANTS** the defendants' motions for summary judgment. Dkt. Nos. 103, 116.

The court **ORDERS** that this case is **DISMISSED**. The clerk will enter judgment accordingly.

This order and the judgment to follow are final. A dissatisfied party may appeal this court's decision to the Court of Appeals for the Seventh Circuit by filing in this court a notice of appeal within **30 days** of the entry of judgment. See Federal Rules of Appellate Procedure 3, 4. This court may extend this deadline if a party timely requests an extension and shows good cause or excusable neglect for not being able to meet the 30-day deadline. See Fed. R. App. P. 4(a)(5)(A). If the plaintiff appeals, he will be liable for the $505 appellate filing fee regardless of the outcome of the appeal. If the plaintiff seeks to proceed on appeal without prepaying the appellate filing fee, he must file a motion in *this court*. See Fed. R. App. P. 24(a)(1). The plaintiff may be assessed another "strike" by the Court of Appeals if it concludes that his appeal has no merit. If the plaintiff accumulates three strikes, he will not be able to file a case in federal court (except a petition for *habeas corpus* relief) without prepaying the full filing fee unless he demonstrates that he is in imminent danger of serious physical injury. Id.

---

[6] Because the court is granting summary judgment to the DOC defendants on the merits, it will not analyze their claim that they are entitled to qualified immunity. See Sierra-Lopez v. County, No. 17-cv-1222-pp, 2019 WL 3501540, at *10 (E.D. Wis. July 31, 2019) (citing Viero v. Bufano, 925 F. Supp. 1374, 1387 (N.D. Ill. 1996); and Antepenko v. Domrois, No. 17-cv-1211, 2018 WL 6065347, at *6 (E.D. Wis. Nov. 20, 2018)).

Under certain circumstances, a party may ask this court to alter or amend its judgment under Federal Rule of Civil Procedure 59(e) or ask for relief from judgment under Federal Rule of Civil Procedure 60(b). Any motion under Fed. R. Civ. P. 59(e) must be filed within **28 days** of the entry of judgment. The court cannot extend this deadline. <u>See</u> Fed. R. Civ. P. 6(b)(2). Any motion under Fed. R. Civ. P. 60(b) must be filed within a reasonable time, generally no more than one year after the entry of the judgment. The court cannot extend this deadline. <u>See</u> Fed. R. Civ. P. 6(b)(2).

The court expects parties to closely review all applicable rules and determine, what, if any, further action is appropriate in a case.

Dated in Milwaukee, Wisconsin this 31st day of May, 2023.

**BY THE COURT:**

**HON. PAMELA PEPPER**
**United States District Judge**